IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| QUESTAR EXPLORATION AND PRODUCTION COMPANY,<br><br>    Plaintiff,<br><br><br><br>    vs.<br><br><br><br>CECELIA P. LAMBETH, et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING CROSS-CLAIMANT JOHN CHASEL AND EVAN GENTILE'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:08-CV-455 TS |
| ALPINE SPRINGS, LLC, et al.,<br>    Cross-claimants,<br><br>    vs.<br><br>CECELIA P. LAMBETH,<br>    Cross-claim Defendant. | |
| CECELIA P. LAMBETH,<br>    Cross-claimant,<br><br>    vs.<br><br>ALPINE SPRINGS, LLC, et al.,<br>    Cross-claim Defendants. | |

1

This matter is before the Court on Cross Claimant John Chasel and Evan Gentile's Supplemental Motion for Summary Judgment on Issue of State Jurisdiction Over Subject Property. For the reasons discussed below, the Court will grant the Motion.

I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."[1] In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[2] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[3]

II. STATEMENT OF FACTS

The case concerns the ownership of a 1/6th interest in Lot 3 of Section 36, Township 14 South, Range 19 East, SLM (the "Subject Property"). Questar Exploration and Production Company ("Questar") brought this interpleader action against Cecelia Lambeth, Alpine Springs, LLC ("Alpine Springs"), John Chasel, and Evan Gentile.[4]

---

[1] Fed.R.Civ.P. 56(c).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[3] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

[4] Docket No. 2. Since the commencement of this action, Questar has been dismissed and Alpine Springs has conveyed all of its right, title, and interest in the Subject Property, and in all

In its Complaint, Questar alleged that it is the owner of an oil and gas lease for a producing gas well located on the Subject Property. Lambeth claims that she is the owner of the Subject Property, while Alpine Springs, John Chasel, and Evan Gentile argue that Lambeth lost any interest that she had in the property through a state court foreclosure action and that they have since acquired the property through various conveyances.

Lambeth is a citizen of the State of Utah, residing in Iron County, Utah. Lambeth is listed as a "mixed blood" on the Ute Indian Tribe membership rolls. Pursuant to a patent dated June 13, 1960, a Fee Simple Patent (the "1960 Patent") was issued to Lambeth conveying an undivided 1/6th interest in the Subject Property.

On February 8, 1980, Lambeth entered into a loan agreement with the State Bank of Southern Utah. Lambeth granted a mortgage on her interest in the Subject Property as collateral for the loan. Lambeth disputes whether the bank obtained a collateral interest over the Subject Property.

A state court foreclosure action was initiated against Lambeth in 1982. Lambeth alleges that the foreclosure action was initiated without her knowledge. As a result of those proceedings, a Judgment and Decree in Foreclosure (the "Foreclosure Order") was issued on August 17, 1983.[5] Lambeth alleges that the Foreclosure Order was procured by fraud.

Alpine Springs, John Chasel, and Evan Gentile claim ownership based on a sheriff's sale conducted pursuant to the Foreclosure Order and various conveyances.

---

claims asserted in this case, to John Chasel. *See* Docket Nos. 33 and 78.

[5]Docket No. 44, Ex. A.

III. PROCEDURAL BACKGROUND

Alpine Springs sought summary judgment on July 21, 2009.[6] Alpine Springs argued, based in part on Lambeth's failure to respond to requests for admission, that it was the owner of the subject property pursuant to a foreclosure sale and subsequent transfers. Lambeth, in response, argued that the state court had no jurisdiction over the land at issue and that any foreclosure was obtained by fraud.

The Court denied summary judgment, noting that Alpine Springs did not respond to Lambeth's jurisdictional argument and that there were genuine issues of material fact concerning Ms. Lambeth's fraud argument.[7]

On June 11, 2010, John Chasel, as successor in interest to Alpine Springs, and Evan Gentile, filed a Supplemental Memorandum in Support of Motion for Summary Judgment on Issue of State Jurisdiction Over Subject Property. In that document, Chasel and Gentile argued that the state court did have jurisdiction over the state property. Lambeth has responded to that document. In addition, the Court has received supplemental briefing on the issues of the *Rooker-Feldman*[8] doctrine and the mineral estate. Lambeth seeks to submit additional briefing on the issue of whether the fee patent was lawfully issued to her in the first place. Chasel and Gentile oppose the Motion. The Court agrees that no further briefing is necessary and that this matter is now ripe for decision.

---

[6] Docket No. 41.

[7] Docket No. 65.

[8] *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

4

IV.  DISCUSSION

In order to properly understand the present dispute, it is helpful to understand the history of the relationship between the Ute Indian Tribe and the federal government.

> Under the then accepted policy of separating Indian tribes from white settlers, the Uintah Valley Reservation was created in 1861 by President Abraham Lincoln.  The Uncompahgre Reservation was created by President Chester A. Arthur in 1882.  From portions of these original reservations, the current Uintah and Ouray Reservation was formed.
>
> Toward the end of the nineteenth century, due to increasing western settlement by whites, federal Indian policy underwent a shift toward assimilating the Indian tribes into the mainstream culture.  Responding to this shift in policy, Congress passed the Indian General Allotment Act of Feb. 8, 1887 . . . .  The Indian General Allotment Act allowed the breakup of Indian reservations into individual homesteads on which, Congress expected, the Indians would farm and become self-sufficient. The ultimate purpose of the [Indian General Allotment Act was] to abrogate the Indian tribal organization, to abolish the reservation system and to place the Indians on an equal footing with other citizens of the country.
>
> . . . .
>
> In 1934, Congress, now moving away from a policy of assimilating tribes, enacted the Indian Reorganization Act (IRA) . . . .  The IRA halted the allotment of tribal land and recognized the right of tribes to draw up constitutions and corporate charters for self-governance.  Pursuant to the IRA, the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937. . . .
>
> Thereafter, in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition, which began with the Constitution, from loosely-knit bands to unified Ute Tribe. . . .[9]

---

[9]*Hackford v. Babbitt*, 14 F.3d 1457, 1459-61 (10th Cir. 1994) (quotation marks and citations omitted).

5

During the 1950s, Congress developed a new approach in federal Indian policy. Congress passed legislation to end the special relationship between certain Indian tribes and the federal government. This legislation terminated federal supervision and services in relation to these tribes. The 1954 [Ute Partition and Termination] Act terminated the federal mixed-blood Ute Indians of the Uintah and Ouray Reservation in Utah.

Under this Act, Congress divided the Ute Tribe into two groups: full-blood members (those with one-half degree of Ute Indian blood and a total Indian blood in excess of one-half) and mixed-blood members (those with insufficient Indian or Ute blood to qualify as full-blood Utes, or those full-blood Utes who elect to be treated as mixed-blood members). The Act required the preparation and publication of rolls listing the full-blood and mixed-blood members of the Tribe. These rolls were published in the Federal Register on April 5, 1956. . . . The Act provided that upon publication of the rolls, the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter.

The Act required the division between the full-blood and the mixed-blood Utes of tribal assets susceptible to equitable and practical distribution. Mixed-blood members received unrestricted control of their proportionate share of the divided property. Federal supervision of mixed-blood members and their property was terminated, except as to [their] remaining interest in . . . tribal assets not susceptible to equitable and practicable distribution. The Act extinguished the Federal trust relationship with mixed-blood members; these members were no longer entitled to any of the services performed for Indians because of his status as an Indian.[10]

The termination of the mixed-blood members of the Ute Indian Tribe was completed when the Secretary of the Interior issued a proclamation, effective August 27, 1961, declaring "[a]ll statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable [to the mixed-bloods.]"[11]

---

[10]*United States v. Felter*, 752 F.2d 1505, 1506-07 (10th Cir. 1985) (quotation marks and citations omitted).

[11]*Ute Distribution Corp. v. United States*, 938 F.2d 1157, 1160 (10th Cir. 1991) (quoting 26 Fed.Reg. 8042 (1961)).

As set forth above, a fee simple patent was issued to Lambeth conveying an undivided 1/6th interest in the Subject Property. Lambeth's 1960 Patent[12] was preceded by an allotment, dated December 13, 1920, to Lambeth's predecessor, Ta Wa Re (the "Allotment Patent").[13] The Allotment Patent was given pursuant to a 1902 Act of Congress. "In 1902, Congress passed legislation directing the Secretary of the Interior to make individual allotments out of the Uintah Valley Reservation by October 1, 1903, provided that a majority of the adult male members of the Ute Indians consented."[14] The Allotment Patent provides:

> NOW KNOW YE, That the UNITED STATES OF AMERICA, in consideration of the premises, has allotted and by these presents does allot unto the said Indian the Land above described, and hereby declares that it does, and will hold the Land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian or in case of the decease of the Indian, for the sole use of the heirs of the said Indian according to the laws of the State or Territory where such Land is located, and that at the expiration of said period, the United States will convey the same by patent to said Indian or to the heirs of the said Indian as aforesaid, in fee, discharged of said trust and free from all charge or encumbrance whatsoever: Provided, That the President of the United States may, in his discretion, extend the said period.[15]

As is clear from the Allotment Patent, the allotment was to be held in trust for 25 years. "At the end of the trust period, the allottee was to receive a patent in fee, free of encumbrance

---

[12] Docket No 74, Ex. A.

[13] Docket No. 88, Ex. A.

[14] *Ute Indian Tribe of the Uintah and Ouray Reservation v. State of Utah*, 114 F.3d 1513, 1516-17 (10th Cir. 1997) ("*Ute V*").

[15] Docket No. 88, Ex. A.

7

and fully alienable."[16] Under the terms of the Allotment Patent, those restrictions were due to expire in 1945, but "[t]he Indian Reorganization act of 1934 extended restrictions indefinitely for allotments subject to it."[17]

The Ute Partition and Termination Act authorized and directed the Secretary of the Interior "to immediately transfer to [a mixed-blood member] unrestricted control of all other property held in trust for such mixed-blood member by the United States, and shall further remove all restrictions on the sale or encumbrance of trust or restricted property owned by such member of the tribe, and Federal supervision of such member and his property shall thereby be terminated."[18] Cecilia Pantaloon (Lambeth) is listed on the termination rolls as a "mixed blood" member.[19]

Under these provisions, the Subject Property was originally an allotment, encumbered by the restriction on alienation and the trust relationship of the United States. However, under the Ute Partition and Termination Act, when Ms. Lambeth elected to receive treatment as a mixed-blood member, the Secretary of the Interior was required to transfer the property to Ms. Lambeth in fee simple. Thus, Ms. Lambeth received unrestricted control of the Subject Property and the restrictions on the sale or encumbrance of the property, as well as the trust relationship of the

---

[16]Felix S. Cohen, *Handbook of Federal Indian Law*, § 16.03[2][b] (Matthew Bender, 2005 ed.) ("Cohen Treatise").

[17]*Id*. at § 16.03[4][b][ii].

[18]25 U.S.C. § 677o(a).

[19]Ms. Lambeth was listed on the "full blood" roll, but was transferred to the "mixed blood" roll by approved appeal. *See* 20 Fed. Reg. 708, 713; 21 Fed. Reg. 2208, 2211.

8

United States, were removed upon the granting of the 1960 Patent.[20] As a result, the Court finds that Ms. Lambeth had unrestricted fee title to the Subject Property.

Lambeth argues that additional briefing is required on the issue of how the fee patent could be issued. This question is answered by the Ute Partition and Termination Act. As stated, the Act authorized and directed the Secretary of the Interior "to immediately transfer to [a mixed-blood member] unrestricted control of all other property held in trust for such mixed-blood member by the United States, and shall further remove all restrictions on the sale or encumbrance of trust or restricted property owned by such member of the tribe, and Federal supervision of such member and his property shall thereby be terminated."[21] This is precisely what happened with the issuance of the 1960 Patent. Therefore, no further briefing is required on this issue.

As set forth above, in 1980 Lambeth granted a mortgage on her interest in the Subject Property as collateral for the loan. In 1983, the Subject Property was judicially foreclosed upon. Ms. Lambeth seeks to collaterally attack the state court Foreclosure Order, arguing that the state court lacked jurisdiction and that the order was procured by fraud.

The *Rooker-Feldman* doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced."[22] In order for Ms. Lambeth to succeed on her

---

[20]Cohen Treatise at § 16.03[4][b][i]("If an allottee receives a fee patent to a trust allotment, or the federal restrictions on alienation are removed from a restricted allotment, the allottee owns the land in fee simple absolute. The land is then subject to voluntary or involuntary alienation under state law, and presumptively to state and municipal property taxes.").

[21]25 U.S.C. § 677o(a).

[22]*Lance v. Dennis*, 546 U.S. 459, 460 (2006) (per curiam) (internal quotations omitted).

claim of ownership of the Subject Property, the Court would have to overturn the state court's Foreclosure Order. Such a step is precluded by the *Rooker-Feldman* doctrine. The question that remains is whether Ms. Lambeth's claims that the state court lacked jurisdiction or that the judgment was obtained by fraud alter this result.

Ms. Lambeth's argument that the state court lacked jurisdiction to issue the Foreclosure Order does not relieve the application of the *Rooker-Feldman* doctrine. "*Rooker-Feldman* applies where the plaintiff in federal court claims that the state court did not have jurisdiction to render a judgment."[23]

The circuits are split on whether to recognize an exception to the *Rooker-Feldman* doctrine where the underlying state court judgment is void for fraud. The Tenth Circuit has not decided this issue.[24] However, the Tenth Circuit noted that "[t]here is good reason to balk at such a step. State rules of procedure provide various means to attack a wrongfully obtained judgment. . . . Construing *Rooker-Feldman* to permit federal reconsideration and nullification of state judgments on grounds that could have been pursued in state court arguably allows under the rubric of collateral attack just another mechanism for lower federal court review unauthorized under [28 U.S.C.] § 1257."[25]

The Court agrees with those courts that have stated that "[t]he fact that the plaintiff alleges that the State Court judgment was procured by fraud does not remove [the] claim[] from

---

[23]*Doe v. Mann*, 415 F.3d 1038, 1042 n. 6 (9th Cir. 2005)

[24]*West v. Evergreen Highlands Ass'n*, 213 Fed. Appx. 670, 674 n.3 (10th Cir. 2007).

[25]*Id*.

the ambit of *Rooker-Feldman*."[26] The proper procedure would be for Ms. Lambeth to seek relief in the state court.

Those cases relied upon by Ms. Lambeth in support of her argument that *Rooker-Feldman* does not apply are inapposite.

Based on the above, title to the property will be quieted in John Chasel and Evan Gentile. To hold otherwise would violate the *Rooker-Feldman* doctrine as it would necessarily require overturning the state court Foreclosure Order.

## V. CONCLUSION

It is therefore

ORDERED that Cross Claimant John Chasel and Evan Gentile's Supplemental Motion for Summary Judgment on Issue of State Jurisdiction Over Subject Property (Docket No. 74) is GRANTED. It is further

ORDERED that Lambeth's Motion for Extension of Time for Supplemental Briefing (Docket No. 95) is DENIED.

The Clerk of Court is directed to enter judgment in favor of John Chasel and Evan Gentile, quieting title in the subject property.

DATED   November 16, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[26]*Smith v. Wayne Weinberger, P.C.*, 994 F.Supp. 418, 424 (E.D.N.Y. 1998).